# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

========================================

| | |
|---|---|
| JANE DOE | : |
| Plaintiff, | : |
| vs. | : CIVIL NO. 3:19-CV-1649 |
| UNITED STATES OF AMERICA, US DEPARTMENT OF HOMELAND SECURITY, KEVIN McALEENAN, in his official capacity as Acting Secretary of US Department of Homeland Security, US IMMIGRATION AND CUSTOMS ENFORCEMENT, MATTHEW T. ALBENCE, Acting Director of US Immigration and Customs Enforcement, WILFREDO RODRIGUEZ, in his official capacity as an agent of US Immigration and Customs and in his individual capacity, | : : : : : : : : : : : : : OCTOBER 19, 2019 |
| Defendants. | |

========================================

## COMPLAINT

Plaintiff Jane Doe, by and through her attorneys, brings this civil action for violation of her rights protected by the Fourth and Fifth Amendments to the United States Constitution, the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. and the laws of the State of Connecticut, caused by the wrongful acts of an agent and employee of Immigration and Customs Enforcement ("ICE") while acting within the scope of his office and employment, for which she seeks compensatory and punitive damages, as well as attorneys' fees and costs.

## JURISDICTION AND VENUE

1. Jurisdiction in this matter is premised on 28 U.S.C. § 1331 in that this District Court shall have original jurisdiction of all civil actions arising under the Constitution and laws of the United States. Jurisdiction is also proper under 27 U.S.C. § 1346(b) which vests this District Court with exclusive jurisdiction of civil actions on claims against the United States for money damages and personal injury caused by the wrongful acts of any employee of the Government while acting within the scope of his employment under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the laws of Connecticut.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims in accordance with 28 U.S.C. § 1367.

3. In accordance with 28 U.S.C. § 2675, Plaintiff submitted an administrative claim for damages to the Department of Homeland Security on July 10, 2018, which was denied by letter dated May 22, 2019.

4. This complaint was filed less than six months from that denial, and was therefore timely under 28 U.S.C. § 2401(b).

5. Venue in the District of Connecticut is proper in accordance with 28 U.S.C. § 1391 because this is the district where a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred.

## PARTIES

6. Plaintiff is an individual and native of Honduras who resides in the State of Connecticut with her husband and two children.

7. Defendant United States of America ("United States") is the proper defendant for those claims brought under the Federal Tort Claims Act.

8. Defendant US Department of Homeland Security ("DHS") is a department of the executive branch of the United States Government and includes the U.S. Immigration and Customs Enforcement ("ICE") among its components.

9. Defendant Kevin McAleenan is sued in his official capacity as the Acting Secretary of DHS. In this capacity, he directs each of the component agencies within DHS, including ICE.

10. Defendant U.S. Immigration and Customs Enforcement is the sub-agency of DHS that is responsible for the enforcement of the immigration law and the supervision of its law enforcement agents.

11. Defendant Matthew T. Albence is sued in his official capacity as Acting Director of ICE.

12. Defendant Wilfredo Rodriguez is and was at all times relevant an agent and employee of ICE. He is sued in his individual and official capacities.

13. Pursuant to 28 U.S.C. § 2680(h), Defendant Rodriguez qualified as a law enforcement officer within the meaning of the Federal Tort Claims Act ("FTCA") and was acting within the scope of his employment at the time of the alleged assaults.

## FACTUAL ALLEGATIONS

14. Plaintiff first had contact with ICE in October 2006 when her brother was arrested by ICE for having entered the United States illegally.

15. After Plaintiff's brother was detained, Plaintiff visited ICE's offices located on the fifth floor at 450 Main Street, Hartford, Connecticut.

16. Plaintiff spoke to Defendant Officer Wilfredo Rodriguez ("Rodriguez") and requested to speak with her brother.

17. Defendant Rodriguez refused her request claiming that Plaintiff's brother had already been taken to jail.

18. Defendant Rodriguez then asked Plaintiff for her passport which she provided. Defendant Rodriguez took Plaintiff's passport to an interior office while she waited in the outside offices.

19. When Defendant Rodriguez returned, he told Plaintiff that she had an order of deportation and that he could arrest Plaintiff. Plaintiff begged Defendant Rodriguez not to arrest her because she had two young children at home.

20. Defendant Rodriguez agreed to let Plaintiff leave, but gave Plaintiff his business card and instructed her to call him when she left the building because Defendant Rodriguez wanted to speak with her.

21. Plaintiff did as instructed and called Defendant Rodriguez after leaving the ICE offices. During the call, Defendant Rodriguez asked Plaintiff for her home address and told Plaintiff he was going to come to her home the next day to talk with her.

4

22. At that time, Plaintiff was living on Wethersfield Avenue in Hartford, Connecticut.

23. When Defendant Rodriguez came to Plaintiff's house the following day, she was at home with her two children.

24. Defendant Rodriguez told Plaintiff that he had verified Plaintiff's information, that he knew that Plaintiff had come to the United States illegally, and that Plaintiff had been ordered deported. Defendant Rodriguez asked Plaintiff why she had not gone to Court and Plaintiff told him that she had not known that she was ordered to appear.

25. Defendant Rodriguez told Plaintiff that he was going to help her. He instructed Plaintiff that she had to return to the ICE offices the following day. Defendant Rodriguez handed Plaintiff a piece of yellow paper with instructions as to the time and place she had to appear.

26. Plaintiff returned to the ICE offices the next day as instructed and went to a different room on the same 5th floor, where, at the end of a hallway, there is a window with protective glass where visitors can talk to the officer at the window.

27. Plaintiff gave the yellow paper to the officer at the window, following which Defendant Rodriguez came out and took Plaintiff to an office with another officer present, Ron Preble ("Preble"). Preble gave Plaintiff his business card.

28. Officers Rodriguez and Preble asked Plaintiff whether she knew others who had orders of deportation. Plaintiff confirmed that she did. The officers told Plaintiff that they were looking for individuals in the United States illegally from Honduras who were criminals, and

because Plaintiff was from Honduras, she could help them to find undocumented immigrants with her contacts.

29. The officers then promised Plaintiff that if she gave them information about those individuals, no actions would be taken against Plaintiff regarding her immigration status and instead she would be allowed to stay in the United States with her children. The officers also indicated they were going to give Plaintiff the names of persons for whom they were searching so that Plaintiff could help them locate these individuals through Plaintiff's contacts and other social media such as Facebook.

30. That same day, Officers Rodriguez and Preble gave Plaintiff a paper captioned "order of supervision", which they told Plaintiff would freeze her order of deportation, and they instructed Plaintiff to call in to report to them.

31. Plaintiff told them that she did not want to be deported because of Plaintiff's children and that she did mot want to be sent back to Honduras. Officers Rodriguez and Preble told Plaintiff that everything would be okay as long as she provided the help that they needed.

32. That week, Plaintiff started giving them the information that they requested from her.

33. For example, three men had stabbed Plaintiff's husband in 2004, and Plaintiff knew the identifies of these men and where they lived. They were three brothers with the last name Romeo. Plaintiff gave their information to ICE, and ICE later arrested them.

34. As Plaintiff started providing Defendant Rodriguez with information, he told Plaintiff she could apply for a work permit, and that if she continued helping them, Defendant

Rodriguez would give Plaintiff and her family immigration documents that would allow them to remain in the United States.

35. In the following months, Defendant Rodriguez would either come to Plaintiff's house, call Plaintiff or instruct her to come to ICE offices where she would provide Defendant Rodriguez with further information regarding people about whom Plaintiff had gathered information, or Defendant Rodriguez would give Plaintiff information about people for whom Defendant Rodriguez was looking.

36. The contact that Plaintiff had with Officers Rodriguez and Preble was regular and constant as Plaintiff did the work that they required her to do in order to remain in the United States.

37. Defendant Rodriguez frequently visited Plaintiff's house and repeatedly telephoned her.

38. For Plaintiff's order of supervision, Plaintiff was required to report to Officer Michele Vetrano ("Vetrano") who helped Plaintiff fill out her work authorization forms. Eventually, Vetrano recommended that Plaintiff and her family members meet with Attorney Abdul Abdurahman ("Abdurahman") for assistance with their ICE paperwork.

39. Vetrano called Abdurahman from the ICE offices and told him that she was referring a family to him. Abdurahman was a paid ICE attorney to whom Vetrano referred other people in Plaintiff's group to get work permits.

40. Vetrano wrote down Abdurahman's number and address for Plaintiff and instructed her to meet with him. Plaintiff had never heard of this attorney before.

41. At the beginning of January of 2007, Defendant Rodriguez called Plaintiff and told her that he was tired because he had just returned from bringing deportees back to Brazil.

42. Rodriguez instructed Plaintiff to meet him at a motel off of Exit 33 on the 91 North because he wanted to show Plaintiff a picture of someone he wanted Plaintiff to locate.

43. When Plaintiff went to the motel, Defendant Rodriguez told Plaintiff that she had to have sexual relations with him. Plaintiff told Defendant Rodriguez that she could not do that because she was married and she would only do the work she had agreed to perform.

44. Defendant Rodriguez told Plaintiff that he was the "wolf" and that without him, Plaintiff's entire family would be deported.

45. Defendant Rodriguez covered Plaintiff's mouth and threw her down on the bed. Defendant Rodriguez put his gun next to Plaintiff and told Plaintiff he would use it if she opened her mouth. Defendant Rodriguez then raped Plaintiff in the motel room.

46. Thereafter, Defendant Rodriguez's sexual assaults continued. Defendant Rodriguez would rape Plaintiff sometimes three or four times a week. Defendant Rodriguez would force Plaintiff to perform oral sex on him and would force Plaintiff to endure and participate in abhorrent sexual behavior.

47. Defendant Rodriguez often handcuffed Plaintiff to chairs while he sexually violated her.

48. While subjecting Plaintiff to repeated sexual assaults, Defendant Rodriguez would constantly remind Plaintiff that he was the "wolf" and he would threaten to kill Plaintiff and

hurt her family. Defendant Rodriguez would tell Plaintiff she was only in the United States because of him.

49. Defendant Rodriguez would constantly threaten Plaintiff that she was in his hands, and that if she told anyone, he would hurt Plaintiff, her children, and her husband and that Plaintiff would pay with her life.

50. Defendant Rodriguez's sexual assaults continued for the next seven years until the fall of 2014.

51. Throughout the years of sexual abuse and control by Defendant Rodriguez, Plaintiff became pregnant three times by Defendant Rodriguez.

52. Plaintiff's first pregnancy by Defendant Rodriguez occurred in 2007. When Plaintiff told Defendant Rodriguez that she was pregnant, Defendant Rodriguez gave Plaintiff cash for an abortion and pain medication, and instructed Plaintiff to terminate the pregnancy.

53. Plaintiff was not having sexual relations with her husband at that time because she was so traumatized by the sexual abuse that she was going through, that there was no question that she was pregnant by Defendant Rodriguez.

54. Plaintiff became pregnant a second time by Defendant Rodriguez in 2009 and a third time in 2013. She terminated both of these pregnancies as well.

55. During this time, Plaintiff became so desperate and scared that she attempted to kill herself four times.

56. Upon and belief, at some point between 2009 and 2010, Defendant Rodriguez's supervisors became suspicious of his activities with informants outside of the office. Once

again, Defendant Rodriguez warned Plaintiff that if she talked about what was happening with him, her family would pay. Defendant Rodriguez told Plaintiff that he was going to let things cool down and threatened that if Plaintiff said anything to ruin Rodriguez's life, that he would ruin Plaintiff's life.

57. Shortly after that conversation, Officer Vetrano called Plaintiff to come to the ICE offices. Vetrano then told Plaintiff that she could not have contact with officers outside of the office because this was prohibited and that Plaintiff could only speak with the officers during the office hours. Officer Vetrano further instructed Plaintiff that from this point forward, Plaintiff should contact Vetrano in connection with her case.

58. Defendant Rodriguez was angry with the changes that were made and told Plaintiff that he would get paid bonuses based on the number of undocumented immigrants that were brought in as a result of Plaintiff's efforts.

59. After a short cooling off period, Defendant Rodriguez resumed calling Plaintiff and demanding to see her. Defendant Rodriguez would tell Plaintiff that he was in charge, and that her family was in his hands. Defendant Rodriguez continued to demand sex from Plaintiff and forcibly rape her.

60. This continued until Plaintiff had an accident in the fall of 2014.

61. Plaintiff was working in construction when Defendant Rodriguez called Plaintiff to demand that she come to see him. Plaintiff knew that this meant that Defendant Rodriguez would demand sex from her. Plaintiff was so shaken after the phone call that she fell off a ladder at work shortly after hanging up the phone with Defendant Rodriguez. Plaintiff fell

from the highest point of the ladder and suffered serious injuries to her neck, back, scapula and ribs.

62. Plaintiff underwent surgery for her injuries and she used the accident and recovery as an excuse as to why she could not see Defendant Rodriguez. But even Plaintiff's injuries and the fact that she was in physical therapy did not deter Defendant Rodriguez. He repeatedly called Plaintiff and demanded that she meet him.

63. On one occasion, Defendant Rodriguez came to the location where Plaintiff was undergoing physical therapy and informed Plaintiff that he was going to be leaving ICE. Defendant Rodriguez threatened Plaintiff and her family again, and warned her that if she ever told anyone about what had happened she and her family would pay.

64. In the spring of 2018, an investigations agent from ICE called Plaintiff saying that ICE agents wished to speak with her. Plaintiff's father had filed an application for asylum seeking protection from deportation to Honduras due to the fact that Plaintiff had been cooperating with ICE agents. According to the agent, Plaintiff's father stated that he was afraid to go back to Honduras because he was in danger from the people his daughter had turned into ICE. The agent told Plaintiff that he was going to come and speak with her, but Plaintiff expressed concerns and told him that what had transpired was very delicate and she was afraid to discuss it.

65. The agent persisted and asked to meet with Plaintiff on May 15, 2018. Plaintiff relented and two agents came to her home on that date. The agents started asking Plaintiff questions about her relationship with Defendant Rodriguez. The agents asked about how

Plaintiff was passing information to Defendant Rodriguez, and Plaintiff told them everything, including the sexual assaults and the abortions.

66. After this meeting, the agents suggested that Plaintiff may want to consult with an attorney about what had transpired. They also told Plaintiff that they were investigating the three agents with whom she was working because they wanted to make sure that this was not happening to other informants.

## UNDER COLOR OF LAW AND SCOPE OF EMPLOYMENT

67. At all times relevant to this complaint, Defendant Rodriguez acted under color of federal law.

68. At all times relevant to this complaint, Defendant Rodriguez acted within the scope and course of his employment as a federal agent, and through the exercise of his authority as a federal agents.

## ICE POLICIES AND PRACTICES

69. ICE maintained a practice and/or custom of allowing male agents to meet with female individuals such as Plaintiff outside of its offices and allowing said agents to intimidate and abuse undocumented individuals.

70. ICE failed to develop meaningful guidelines or oversight mechanisms or provide adequate training, or otherwise ensure accountability for its agents to ensure that they operated within constitutional confines.

71. ICE has used the threat of deportation as a tool for forcing individuals such as Plaintiff to act as confidential informants and subjecting them to unsupervised harassment and control by their ICE handlers.

72. ICE's policies violated the Constitutional rights of Plaintiff and were a proximate cause of her injuries.

## CAUSES OF ACTION

### COUNT I
### FEDERAL TORT CLAIMS ACT: ASSAULT AND BATTERY
(against United States)

73. Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

74. The actions of Defendant Rodriguez were intentional, harmful and offensive to the Plaintiff, causing her physical injury, pain, and emotional distress, and destroying her personal dignity.

75. The actions of Defendant Rodriguez were undertaken without the permission and consent of Plaintiff. He acted with the intent to cause injury or the intent to create fear or apprehension in Plaintiff.

76. The actions of Defendant Rodriguez constitute the torts of assault and battery under the laws of Connecticut.

77. The injuries suffered by Plaintiff were the direct and immediate consequence of the actions of Rodriguez.

78. The losses are either permanent and continuing and Plaintiff will continue to suffer these losses in the future.

79. Under the Federal Tort Claims Act, the United States of America is liable for these actions.

## COUNT II
## FEDERAL TORT CLAIMS ACT: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (against United States)

80. Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

81. The actions of Defendant Rodriguez as described above constitute the tort of intentional infliction of emotional distress under the laws of Connecticut.

82. Defendant Rodriguez engaged in extreme and outrageous conduct, acted intentionally and with reckless disregard for Plaintiff's rights and feelings and with deliberate indifference to the certainty that Plaintiff would suffer emotional distress.

83. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer severe mental anguish, humiliation, pain, severe emotional distress and physical distress. The general and specific damages suffered by Plaintiff as a proximate result of the wrongful actions of the Defendants exceed the jurisdictional minimum of the Court.

84. Plaintiff is informed and believes, and based upon information and belief alleges, that the outrageous conduct of Defendant Rodriguez described above was preformed with

conscious disregard for Plaintiff's rights and feelings. As a result, Plaintiff is entitled to punitive or exemplary damages from Defendant in a sum according to proof at trial.

85. Under the Federal Tort Claims Act, the United States of America is liable for these actions.

## COUNT III
## FEDERAL CONSTITUTIONAL CLAIM: FOURTH AMENDMENT
### (Against Wilfredo Rodriguez)

86. Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

87. The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.

88. Defendant Rodriguez, acting under color of federal law, violated Plaintiff's clearly established rights under the Fourth Amendment of the United States Constitution.

89. By reason of the wrongful conduct of Defendant, Plaintiff suffered and continues to suffer from severe emotional distress and physical harm, pecuniary/economic damage.

## COUNT IV
## FEDERAL CONSTITUTIONAL CLAIM: FIFTH AMENDMENT
### (Against Wilfredo Rodriguez)

90. Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

91. The Fifth Amendment to the United States Constitution assures equal protection as a component of the due process protections it guarantees.

92. Plaintiff enjoys a liberty interest in her personal security and in being free from Defendants' use of unnecessary and excessive force or intrusion against her person.

93. Defendant Rodriguez, acting under color of federal law, violated the Plaintiff's clearly established right to equal protection secured under the Due Process Clause of the Fifth Amendment of the United States Constitution.

94. By reason of the wrongful conduct of Defendant, Plaintiff suffered and continues to suffer from severe emotional distress and physical harm, pecuniary/economic damage

95. Accordingly as a direct and proximate result of the intentional and willful actions of Defendant, Plaintiff asks for judgment to be entered against Defendant.

## COUNT V
## NEGLIGENCE
### (Against ICE and Department of Homeland Security)

96. Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

97. Immigration and Customs Enforcement, during relevant times to this complaint, had evolved into a de facto intelligence-gathering organization, in addition to its immigration and customs work.

98. During all times relevant to this complaint, ICE was focused on deporting undocumented aliens, particularly individuals who have committed crimes.

99. During all times relevant to this complaint, ICE worked closely with confidential informants.

100. During all times relevant to this complaint, ICE agents developed sources with useful information as a means of investigating undocumented aliens, particularly those engaged in criminal activity.

101. During all times relevant to this complaint, ICE provided confidential informants with benefits In exchange for information in the form of cash, a work permit, and, in some cases, immigration benefits.

102. During all times relevant to this complaint, ICE had policies and regulations for agents working with confidential informants with oversight from HS

103. Informants are registered and receive identification numbers, background checks are conducted. Supervisors must approve the agreements.

104. Upon information and belief, ICE maintained an entire handbook solely on the handling of informants.

105. Upon information and belief, ICE has failed to follow said policies and regulations resulting in harm to informants, including Plaintiff.

106. Defendants ICE and Department of Homeland Security had implemented policies for investigative and enforcement agents regarding contact with immigrants.

107. ICE violated its policies by continuing to allow Defendant Rodriguez to have contact with Plaintiff outside of ICE's offices.

108. Defendant Rodriguez's supervisors allowed Defendant Rodriguez to run rampant in his contacts and intimidation of Plaintiff.

109. Defendant Rodriguez became so emboldened by his lack of supervision that felt he could do anything to Plaintiff without repercussions.

110. During all relevant times to this complaint, DHS was responsible for the oversight and compliance of said policies and regulations by ICE in its use of confidential informants.

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

111. Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

112. The doctrine of equitable tolling applies to toll any applicable statutes of limitations. The threats against Plaintiff and her family by Rodriguez constitute an extraordinary manner by which Plaintiff was prevented from timely asserting her rights.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all non-Federal Tort Claims Act claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff is entitled to damages from the Defendants, and she hereby prays that judgment be entered in her favor and against Defendants as follows:

1. Award compensatory damages as to all Defendants in the amount of $10,000,000.00;

2. Award punitive damages as to Defendant Rodriguez;

3. Award reasonable attorney's fees and costs;

4. Grant such further and additional relief at law or in equity that this Court may deem appropriate or proper.

RESPECTFULLY SUBMITTED, this 19th day of October, 2019

GEORGE W. KRAMER
Attorney for Plaintiff, Jane Doe

BY: _____
George W. Kramer
Federal Bar No.: ct 07982
30 Clemens Court
Rocky Hill, CT 06067
Telephone (860) 212-4871
Facsimile: (860) 529-5104
E-mail: gkramerlaw@gmail.com