**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

===================================

| | |
|---|---|
| JANE DOE | : |
| | : |
|      Plaintiff, | : |
| | : |
| vs. | : CIVIL ACTION NO. 3:19-CV-1649-JCH |
| | : |
| UNITED STATES OF AMERICA, | : |
| US DEPARTMENT OF HOMELAND | : |
| SECURITY, | : |
| KEVIN McALEENAN, | : |
| in his official capacity as | : |
| Acting Secretary of US Department | : |
| of Homeland Security, | : |
| US IMMIGRATION AND | : |
| CUSTOMS ENFORCEMENT, | : |
| MATTHEW T. ALBENCE, Acting Director of US | : |
| Immigration and Customs Enforcement, | : |
| WILFREDO RODRIGUEZ, in his official | : |
| capacity as an agent of US Immigration and | : |
| Customs and in his individual capacity, | : |
| | : |
|      Defendants. | |

===================================

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO THE GOVERNMENT'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**INTRODUCTION**

Plaintiff Jane Doe, an undocumented immigrant has brought this action against Wilfredo

Rodriguez, ("Rodriguez") the United States of America, U.S. Department of Homeland Security

(DHS), U.S. Immigration and Customs Enforcement (ICE), Alejandro Mayorkas, in his capacity

as Director of DHS, and Tae Johnson, in his capacity as Acting Director of ICE (collectively,

"ICE"). Plaintiff's claims against ICE are brought pursuant to the Federal Tort Claims Act

FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, and arise out of Plaintiff's use as a confidential informant for ICE while under an order of supervision, while she and her family were subject to deportation, during which time she was sexually assaulted, threatened and intimidated by Rodriguez from 2007 through 2014. Plaintiff will cite to the relevant paragraph of its Statement of Undisputed Material Facts (SOF ¶ ) for relevant references to the record.

FACTUAL BACKGROUND

In 2007 Jane Doe was an illegal alien who had been ordered deported, but after going to ICE's office and meeting with Rodriguez, Jane Doe was placed under an order of supervision because she agreed to cooperate with information as a confidential informant. (SOF ¶ 25) Rodriguez and Michelle Vetrano-Antuna were both deportation officers at that time working for Enforcement and Removal Operations, (ERO), a part of Immigration and Customs Enforcement (ICE) and throughout the years of 2007-2014 (SOF ¶ 21) ERO is responsible for the removal of individuals after they've been ordered removed by an immigration judge and for locating and arresting individuals who have violated immigration law. (SOF ¶ 22) ERO is prohibited by policy from using confidential informants. (SOF ¶ 23) Jane Doe, however agreed to provide information to ERO about illegal immigrants. (SOF ¶ 24) Jane Doe and her family were not only not deported, but Jane Doe was granted a work permit in 2007.(SOF ¶ 31) Rodriguez carried a gun as part of his employment with ICE, and handcuffed and arrested illegal immigrants. (SOF ¶ 33)

Jane Doe continued to provide information to Rodriguez during the period from 2007 to 2014 and to Vetrano-Antuna through 2012. During this time period Rodriguez Rodriguez used Jane Doe like a slave, not only sexually exploiting her, but also continuing to demand

information on illegal immigrants. (SOF ¶ 43) Rodriguez forced Jane Doe to go to his house and force sexual relations and forced Jane Doe to continue to provide him with information on illegal immigrants. (SOF ¶ 39)   Rodriguez even branded Jane Doe, leaving permanent marks on her abdomen. (SOF ¶ 40)

Rodriguez also continued to force Jane Doe to help him investigate, locate and inform on illegal immigrants. (SOF ¶ 42)   As a result of the rapes, Jane Doe got pregnant multiple times and had abortions, became very depressed and tried to commit suicide multiple times. (SOF ¶ 44) Jane Doe provided so much information on the location of illegal immigrants that Michelle Vetrano-Antuna asked her to stop providing information in her [Honduran] community to ERO, including Rodriguez because she was concerned about her safety. and the safety of her family. (SOF ¶ 34)  Michelle Vetrano-Antuna considers Jane Doe to be extremely truthful and confirmed that she was always very cooperative.(SOF ¶ 32)

Rodriguez used his position of extraordinary authority threatened threaten and intimidate her from speaking to anyone about what he had done.  He even threatened Jane Doe's husband after he had found out that Rodriguez had raped Doe.  (SOF ¶  41)   During the period between 2007 and 2014 Jane Doe was threatened by Rodriguez with deportation of herself and her family and death.  (SOF ¶  37)   Shortly before Rodriguez was to retire from ICE, he threatened to kill Jane Doe if she ever told anyone about what had happened. (SOF ¶  38)  Rodriguez invoked his right against self incrimination in response to deposition questions about raping and threatening Jane Doe as well as threatening her and her entire family with deportation if she ever told anyone about what he had done to her.  (SOF ¶  12 through 20)

During 2007 to 2014, it was a violation of ICE and ERO guidelines to threaten someone with deportation unless they provided ERO with information about illegal immigrants. (SOF ¶ 26) During 2007-2014 and also currently it has been and is a prohibited practice for ERO or any deportation officer working for ERO to enter into an agreement with an illegal immigrant under an order of supervision to exchange information for benefits. (SOF ¶ 27) Deportation Officers working for ERO had the discretion and the authority to elect not to enforce a deportation order for a person who was providing beneficial information to ERO. (SOF ¶ 28) Deportation Officers working for ERO had the discretion and the authority to revoke an order of supervision thereby subjecting a person to immediate removal from the United States. (SOF ¶ 29) Deportation officers were not allowed to threaten individuals under orders of deportation to provide information or to threaten them with a termination of an order of supervision for any reason, including refusal to have sexual relations. (SOF ¶ 30) Although ERO does not condone illegal activities by its agents, a fugitive who is captured and deported is beneficial to the objectives and mission of the ERO. (SOF ¶ 35) Any type of sexual relation between either a deportation officer, or a detention enforcement officer from ERO with Jane Doe would have violated the most basic code of conduct of ICE and ERO. (SOF ¶ 36).

**LEGAL STANDARD**

"A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; see also *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a

Case 3:19-cv-01649-JCH   Document 81   Filed 06/14/21   Page 5 of 15

reasonable jury could return a verdict for the nonmoving party.'" Nick's Garage, 875 F.3d at

113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are

material is determined by the substantive law. Anderson, 477 U.S. at 248. "The same standard

applies whether summary judgment is granted on the merits or on an affirmative defense...."

*Giordano v. Market Am., Inc.,* 599 F.3d 87, 93 (2d Cir. 2010). The moving party bears the initial

burden of informing the court of the basis for its motion and identifying the admissible evidence

it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,*

477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must

set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d

255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated

speculation' but 'must come forward with specific evidence demonstrating the existence of a

genuine dispute of material fact." *Robinson v. Concentra Health Servs*., 781 F.3d 42, 34 (2d Cir.

2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the

nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham*

*v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000).

Rodriguez's asserting his Fifth Amendment right to remain silent as to all questions

during his deposition should result in this Court drawing adverse inferences against Rodriguez

regarding the specific questions to which he invoked the Fifth.   Those questions Rodriguez

refused to answer go to the very heart of this case.   There is a "prevailing rule that the Fifth

Amendment does not forbid adverse inferences against parties to civil actions when they refuse

to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425

U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976) (allowing adverse inference to be drawn

against state prison inmates that refused to testify in prison disciplinary proceedings)   I n   a n

instance where a party stands on an invocation of the Fifth Amendment privilege made during

discovery, fairness dictates that the jury be informed of the invocation of the privilege and

permitted to draw an adverse inference from this fact. See *Penfield v. Venuti,* 589 F. Supp. 250,

255 (D. Conn. 1984) ("Permitting an adverse inference to be drawn against a party who

invokes the Fifth Amendment privilege during discovery prevents use of the privilege as a

weapon in civil litigation.")*Huaman v. Sirois*, No. 3:13CV484 (DJS), 2015 U.S. Dist. LEXIS

51873 (D. Conn. Apr. 20, 2015)   "A party who asserts the privilege against self-incrimination

must bear the consequence of lack of evidence, and the claim of privilege will not prevent an

adverse finding or even summary judgment if the litigant does not present sufficient evidence to

satisfy the usual evidentiary burdens in the litigation." *United States ex rel. Bilokumsky v. Tod*,

263 U.S. 149, 153-54, 44 S. Ct. 54, 68 L. Ed. 221.

Given that Rodriguez invoked his right against self incrimination in response to all

questions about raping and threatening Doe and her entire family, this Court could deny

defendants motions for summary judgment on that basis alone.


**ARGUMENT**

A. THE STATUTE OF LIMITATIONS HAS BEEN TOLLED BY THE DOCTRINE OF
EQUITABLE TOLLING

The equitable tolling doctrine was discussed in *Gager v. Sanger*, 95 Conn. App. 632, 638,

897 A.2d 704. Equitable tolling is applied if a party other than the plaintiff "bore responsibility

for some form of impediment that prevented or made it difficult for the plaintiff to file earlier."

*Gager v. Sanger,* Superior Court, judicial district of Waterbury, Complex Litigation Docket,

Docket No. X02-CV-03-0182451-S, 2005 Conn. Super. LEXIS 589 (February 25, 2005, Schuman, J.), aff'd, 95 Conn.App. 632, 897 A.2d 704, cert. denied, 280 Conn. 905, 907 A.2d 90 (2006). Connecticut courts have applied equitable tolling in situations where a plaintiff can show he "(2) was prevented in some extraordinary manner from timely asserting his rights,…" *Bates v. City of Bristol,* 2018 U.S. Dist. LEXIS 49687 *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 591 (3d Cir. 2005). *Young v. United States,* 535 U.S. 43, 49 (2002). If ever a case merited the application of the equitable tolling doctrine, Jane Doe's case would be the poster child for it. She was afraid for her life and that of her family's, which is why she did not retain an attorney to pursue this case until after she was recommended to do so by the Immigration and Customs Enforcement investigators.

The case of *Noguera v. Hasty*, No. 99 Civ. 8786 KMWAJP, 2001 U.S. Dist. LEXIS 2458, 2001 WL 243535 (S.D.N.Y. Mar. 12, 2001), involved a female inmate who brought an action under 42 U.S.C. § 1983 alleging that she had been raped and sexually abused by a state correctional officer. The limitations period was equitably tolled based on the plaintiff's allegation that the officer had verbally and physically threatened her into remaining silent about the rape. 2001 U.S. Dist. LEXIS 2458, [WL] at *6. Equitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the plaintiff's control made it impossible to file a claim on time. *Alvarez-Machain v. United States*, 107 F.3d 696, 700 (9th Cir. 1997). The sexual assaults, severe depression, suicide attempts, threats on Doe's life, threats against her family by Rodriguez constitute extraordinary circumstances which justify Doe's delay in filing her claim. Rodriguez should not be entitled to benefit from the fact that during the period between 2007 and 2014 he

threatened plaintiff's life and threatened her and her family with deportation See *Brockamp v. United States*, 67 F.3d 260 (9th Cir. 1995). SOF ¶ 23, 24.

ICE and Rodriguez both argue that plaintiff is not entitled to equitable tolling because Plaintiff was not diligent in her efforts to pursue her rights during the time period she seeks to toll, and that no extraordinary circumstance stood in her way, preventing her from doing so. This argument must fail, as Rodriguez not only threatened Doe's life, but her family as well. Doe was well aware of what Rodriguez was capable of serious criminal behavior.

B. RODRIGUEZ WAS ACTING WITHIN THE SCOPE OF HIS EMPLOYMENT

In *Mullen v. Horton*, 46 Conn. App. 759, 700 A.2d 1377 (1997) The Connecticut appellate court discussed the issue of whether an employee acts within the scope of their employment when committing a sexual assault. In Mullen, a parishioner alleged that a priest had sexually assaulted her over a two and a half-year period. He had assaulted her while she was receiving counseling from the priest. The appellate court reversed the trial court's grant of summary judgment in favor of the church, the priest's employer. The church, similarly to what ICE is arguing in this case, claimed that the priest was prohibited from engaging in any sexual activity with the plaintiff and therefore was not acting within his scope of employment. The court held that the priest's sexual exploitation of the parishioner arose out of his church sanctioned relationship with the plaintiff. *Id.* at 765. Thus, a trier of fact could reasonably determine that his sexual relationship with the parishioner was a misguided attempt at pastoral-psychological counseling but not an abandonment of church business. *Id.* The court stated that "[w]hile a servant may be acting within the scope of his employment when his conduct is negligent,

disobedient and unfaithful . . . that does not end the inquiry. Rather, the vital inquiry in this type

of case is whether the servant on the occasion in question was engaged in a disobedient or

unfaithful conducting of the master's business, or was engaged in an abandonment of the master's

business. . . . Unless [the employee] was actuated at least in part by a purpose to serve a

principal, the principal is not liable."  (Internal quotation marks omitted.) *Mullen* at 764. The

court went on to state that "When the servant is doing or attempting to do the very thing which

he was directed to do, the master is liable, though the servant's method of doing it be wholly

unauthorized or forbidden.  . . . **That the servant disobeyed the orders of the master is never a**

**sufficient defense.** …" Id. (Emphasis added)   In addition, the Mullens court found that this

issue is one that should not be decided on summary judgment.  "Ordinarily, it is a question of

fact as to whether a wilful tort of the servant has occurred within the scope  of the servant's

employment and was done to further the master's business. . . . But there are occasional cases

where a servant's digression from duty is so clear-cut that the disposition of the case becomes a

matter of law." *Id.* at 765.  As in Mullen, Rodriguez sexual exploitation of Doe arose out of his

ICE sanctioned relationship with Doe.  In addition, Rodriguez used and leveraged his control

over Doe to further ICE"s objectives.

      In *Glucksman v. Walters*, 38 Conn. App. 140, 659 A.2d 1217 (1995) the Connecticut

appellate court discussed the issue of whether an employee who commits an intentional assault

acts within the scope of his employment. The plaintiff was attacked and seriously injured by a

YMCA employee during a basketball game at the YMCA. The  appellate court reversed the trial

court's directed verdict on vicarious liability claim against the YMCA.  The court held that a jury

could have reasonably found that but for the tortfeasor's employment he would not have been at

the basketball court and that the YMCA benefitted from having one of its employees at the court to maintain order.  *Id. at* 144.  The court stated that  "The doctrine of respondeat superior focuses on the employee's conduct rather than on the employer's knowledge or approval of the acts. If the employee acted with apparent authority in furtherance of employer business, the employer's consent or ratification of the misconduct is irrelevant . . . even an innocent employer must compensate an injured party.'" ...If the jury found the plaintiffs' evidence credible, it could reasonably find that, but for his position as an employee, Walters would not have been on the basketball court, that Walters had been responsible for helping to maintain order on the basketball court, that the YMCA benefited when Walters played basketball because it had an employee on the court to help keep order, that the commission of fouls disrupts a basketball game, and that Walters attacked Glucksman in a misguided effort to prevent Glucksman  from committing fouls and disrupting the game." *Glucksman* at 144-145.  The court also explained that a vital inquiry is whether the employee "was actuated **at least in part'** by a purpose to serve the employee. *Id. at* 144. (Emphasis added)  As in Glucksman, but for the Rodriguez employment with ICE, he would not have been in position to assault or threaten Doe, and ICE benefitted from having Rodriguez pressure Doe to continue to provide information to the point where she and her family were not safe.

Federal courts have described Connecticut law on the issue of the scope of employment as a flexible, as opposed to mechanical analysis.  "We also note that Connecticut law follows no mechanical formula or set or formulae relating to 'deviations,' 'detours,' "frolics,' and the like, labels in the legal literature of vicarious responsibility. Rather, Connecticut courts look to the individual facts in a given case and the context in which they occur, and balance the factors

involved in a determination of scope of employment." *Cronin v. Hertz Corp.*, 818 F.2d 1064,

1066 (2d Cir. 1987)  Defendants seek to apply a mechanical test to the issue of whether

Rodriguez was acting within the scope of his employment with ICE.  This, however, is not

consistent with Connecticut law.  Doe's claims all arise out of Rodriguez's role as a deportation

officer and his control over her.  Doe had an order of deportation and was forced to provide

information to Rodriguez and ICE. Not only was plaintiff engaged in the dangerous position of

being an informant to Rodriguez and ICE, she was under constant threat of deportation along

with her family.  Because all of the acts arose out of this relationship and because ICE benefitted

from plaintiff's information on individuals Rodriguez and ICE were seeking to find and deport,

the acts were committed within the scope of Rodriguez's employment.                          ICE

employed Rodriguez as a deportation officer.  His job was to locate, arrest, and deport illegal

immigrants in connection with his other duties.  He worked at both the ICE offices in Hartford,

and out in the field. Rodriguez ' job as a deportation officer gave him direct and extraordinary

power and authority over plaintiff. The plaintiff was subject to deportation and was used by

Rodriguez to obtain information on hundreds of individuals.  His authority over plaintiff was

gained directly through his employment with ICE.  But for his position with ICE, Rodriguez

would not have been in a position to sexually assault plaintiff.  Further, Rodriguez is a federal

agent given public trust and authority and ICE should be held responsible where its agents abuse

that authority.   A trier of fact could reasonably find that Rodriguez' exercise and control over

plaintiff, including his sexual assaults,  were of benefit to Rodriguez and ICE's mission to locate

and deport illegal immigrants.  In summary,  a trier of fact could reasonably find that the sexual

relations between Rodriguez and the plaintiff directly grew out of, and were the immediate and

proximate results of, ICE's business of using the plaintiff to advance its business. ICE benefitted from Rodriguez' actions.

The defendants emphasize that it is unforeseeable that an ICE agent would abuse his or her power for sexual exploitation. Unfortunately, it is an established fact that ICE agents have sexually abused countless individuals under their supervision and control.  See Exhibit "G" and the articles contained therein, of which the plaintiff asks the Court to take judicial notice. Plaintiff's allegations are not remote or tenuous to Rodriguez employment, they are intertwined and inseparable, related to Rodriguez and ICE's efforts to locate and apprehend individuals who were illegal immigrants.

C. ICE'S VIOLATIONS OF ITS OWN POLICIES CAUSED PLAINTIFF TO BE SUBJECTED TO RODRIGUEZ POWER AND CONTROL

In 2007 Jane Doe was an illegal alien who had been ordered deported, but   after going to ICE's office and meeting with Rodriguez, Jane Doe was placed under an order of supervision because she agreed to cooperate with information as a confidential informant.  It was against ICE's policy, and prohibited to use confidential informants during 2007 to 2014. Deportation officers, including Rodriguez and Vetrano, were prohibited from conferring immigration benefits on Jane Doe, or anyone under an order of supervision.  But that is precisely what they did. Not only was Doe and her family not deported, she was placed under an order of supervision and granted a work permit   There are few greater benefits ICE could have arranged for Doe. ICE agents, however, also had the power to terminate the order of supervision, giving their agents extra-ordinary power over Doe. The decision to use Doe as a confidential informant violated ICE's policies and opened the door for Rodriguez to assault her as he had her and her family's

future in his hands.  The failure of ICE to adhere to its policies in an attempt to apprehend illegal immigrants was a proximate cause of Doe's injuries.

Contrary to ICE's assertion, Doe has submitted substantive evidence of facts to support violations of policies testified to by multiple supervisors and deportation officers.   The duty violated by ICE is a duty to Doe.   The claims by Doe are not that ICE failed to supervise Rodriguez, but they used her as a confidential informant, arranging for immigration benefits with the knowledge that those actions were a direct violation of their policies.   These claims against ICE are not based on a respondent theory, but on a direct failure to abide by their own policies. As conceded by ICE, pursuant to the FTCA, 28 U.S.C. § 1346(b)(1), federal district courts have exclusive jurisdiction over damages claims against the United States for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting withinthe scope of his office or employment. *Carroll v. United States,* 674 F.Supp.2d 346, 348-349 (D. Puerto Rico 2009).    The plaintiff has properly sued the United States under the FTCA.

**CONCLUSION**

Wherefore, for all of the foregoing reasons, the plaintiff requests that the Court deny ICE's motions for summary judgment.

Date: June 14, 2021

Respectfully submitted,

PLAINTIFF, JANE DOE

By:/s/ George W. Kramer, Esq.
George W. Kramer
Federal Bar No. ct 07982
gkramerlaw@gmail.com
Debra D. Klingsberg
Fla. Bar No. 767921
dklingsberglaw@gmail.com
30 Clemens Court
Rocky Hill, CT 06067
Tel: 860-212-4871

## **CERTIFICATION**

I hereby certify that on the 14th day of June, 2021, the foregoing document was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ George W. Kramer, Esq.
George W. Kramer